Filed 11/12/15  P. v. Holston CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>PAUL HOLSTON,<br><br>    Defendant and Appellant. | D065998<br><br><br>(Super. Ct. No. PLH27418) |

APPEAL from an order of the Superior Court of San Diego County, Desiree Bruce-Lyle, Judge.  Affirmed.

Michael Satris, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Michael P. Pulos, Deputy Attorneys General, for Plaintiff and Respondent.

I.

INTRODUCTION

Paul Holston appeals from a trial court order revoking his parole and remanding him to the custody of the Department of Corrections and Rehabilitation (the Department).

On appeal, Holston claims that the trial court erred in permitting the People to introduce hearsay statements in support of the revocation because the People failed to establish good cause warranting such admission. Holston also contends that the trial court erred in denying his motion to strike the testimony of an investigator concerning admissions that Holston made to the investigator during an interview because the People failed to disclose a tape-recording of the interview to the defense prior to the hearing. We affirm the order.

II.

FACTUAL AND PROCEDURAL BACKGROUND

A.   *Procedural background*

In June 2013, Holston was granted parole after having served more than 21 years in prison for second degree murder.

The Department filed a petition to revoke Holston's parole in March 2014. In a parole violation report attached to the petition, the Department alleged that

2

Holston violated his parole by violating Penal Code[1] section 134, which prohibits preparing any false evidence with the intent to use the evidence in a proceeding authorized by law.

The trial court found probable cause to support revocation, preliminarily revoked Holston's parole, and set a good cause hearing to determine whether to issue an order revoking Holston's parole.

The trial court held the good cause hearing in April 2014. At the conclusion of the hearing, the court determined that good cause existed to find that Holston had violated his parole. The court revoked Holston's parole and committed him to the custody of the Department.

Holston timely appeals.

B.    *Factual background*

   1.    *The People's evidence*

Holston operated a business called Criminal Justice Offenders Services (CJOS). In September 2013, Correctional Officer Earl Parks received a package that CJOS had sent to a state prison inmate, Anthony Rosser. In an attempt to determine whether CJOS was a "legitimate" company, Officer Parks called CJOS and posed as an inmate preparing for a parole suitability hearing. Officer Parks inquired as to the services that CJOS offered inmates seeking parole. Holston, who identified himself by his prison moniker—Shadow—told Officer Parks that

---

[1]    Unless otherwise specified, all subsequent statutory references are to the Penal Code.

3

he could provide Parks with job letters, support letters, and certificates, for a fee. Holston did not mention that Parks would have to take classes or engage in any other activities in order to obtain such documents.

Officer Parks examined the package that CJOS had sent Rosser and found several documents directed to a panel of the Board of Parole Hearings: (1) a letter from CJOS, signed by Holston as "Paul Anthony,"[2] stating that CJOS could provide Rosser with supportive services upon his release on parole;[3] (2) a letter and certificate dated February 12, 2013, signed by Melody lbarra, stating that Rosser had completed an anger management course from an entity called Anderson & Anderson; (3) a letter from Jan Hill, president of a business called Southern California Economic Workforce, saying that he would hire Rosser upon Rosser's release from custody; and (4) a certificate signed by Curtis A. Caldwell attesting that Rosser had completed a custodial training program.

Officer Parks called CJOS a second time in January 2014, posing as the same inmate who had called previously. Holston answered the call and identified himself by his actual name. During this pretextual call, which lasted approximately 50 minutes, Holston offered to provide Parks with employment letters, anger management course certificates, sponsor support letters, and

---

[2]     Holston's full name is Paul Anthony Holston.

[3]     The letter also states, "Upon reviewing Mr. Rosser's resume, biography, application, and his accomplishments while incarcerated, the staff of [CJOS] truly believes that Mr. Rosser's transformation and his desire to seek out self-help programs and a solid life plan while incarcerated is and will be greatly appreciated by society."

4

domestic violence course certificates. Holston informed Parks that some of the courses ordinarily would take two years to complete. When Parks told Holston that his parole hearing would be taking place later that year, Holston responded that "he could make it happen and that he could do so for a fee."

Holston also told Parks that he should procure support letters or job offers from his girlfriend, and that she should disguise their relationship from the parole board. Holston also told Parks to have his girlfriend's family members falsely state that they had known him before he was incarcerated.

Special Agent Gregory Hopkins conducted an investigation into the validity of the documents sent by CJOS to Rosser, including the letter to Rosser from Ibarra stating that Rosser had completed an Anderson & Anderson anger management course. Special Agent Hopkins learned that Holston and Ibarra had a romantic relationship for five years and that they married in December 2013. Special Agent Hopkins also spoke to a Mr. Anderson[4] from Anderson & Anderson who informed Hopkins that Ibarra was not certified to teach Anderson & Anderson courses.

With respect to the employment offer from Jan Hill, Special Agent Hopkins learned that Hill was an unemployed transient parolee. With respect to the custodial training certificate from Curtis Caldwell, Special Agent Hopkins discovered that Caldwell was a former parolee.

---

[4] Special Agent Hopkins did not state Mr. Anderson's first name.

Special Agent Hopkins interviewed Rosser. Rosser stated that he had met Holston while he was in prison. Holston told Rosser that he had a company that helped parolees obtain documents needed for parole suitability hearings. According to Special Agent Hopkins, Holston told Rosser that he would "help him gain the documents that he need[ed]," and that Holston would "finish getting together the documents when [Holston] was paroled . . . ."

With respect to the documents that Rosser received in the package from CJOS, Rosser told Special Agent Hopkins that he received the documents from Holston and Rosser admitted that they were fraudulent. Specifically, Rosser admitted that he had not actually completed any coursework or undergone any training in order to obtain the anger management or custodial certifications. In addition, Rosser admitted that he had never communicated with Hill concerning an offer of employment. Rosser stated that he did not know Ibarra, Hill or Caldwell.

Special Agent Hopkins also interviewed Holston. Holston admitted that he, rather than Hill, had signed the employment offer sent to Rosser. Holston said that he had signed the letter on behalf of Hill, and that he had a business relationship with Hill.[5] Holston stated that he did not know Caldwell, and that he was an associate of Ibarra's.

Holston's parole agent, Santos Sanchez, testified that he had spoken with Holston about his employment, and that Holston had never told him about CJOS.

---

[5] The letter bears an illegible signature above the typewritten name, "Mr. Jan Hill," and the word, "President."

6

## 2. *The defense*

Ibarra's employer, James Sanders, testified that he believed that Ibarra was a certified anger management counselor. Sanders stated that he sent Ibarra to the Anderson & Anderson anger management course and that she completed the course in 2010.

## 3. *The court's ruling*

At the conclusion of the hearing, the trial court found good cause to revoke Holston's parole. The court reasoned in part:

> "The court finds the People have met their burden. There is more than one smoking gun in this case, and to this court it is quite clear what transpired. Officer Parks'[s] phone conversations with Mr. Holston speak volumes. [¶] And that phone conversation pretty much laid out the [modus operandi] of Mr. Holston and his Criminal Justice Offenders Services and how he goes about putting the packet together.
>
> "In his own statement he admitted preparing the packet for Mr. Rosser and also admitted in his statement that he signed that employment letter from Jan Hill, that he was in a business relationship with Mr. Hill, and so he signed the letter on his behalf.
>
> "So when you look at that, which is one smoking gun and his phone conversation with Officer Parks, which lack any reference whatsoever about Officer Parks taking any classes, therefore suggesting that he knew that documents would be prepared without anyone taking any classes [sic].
>
> "The interaction between Officer Parks and Mr. Holston is very telling about the operation that Mr. Holston was running. And the entire discussion makes reference to the whole idea about setting a picture acceptable to the Board of Parole Hearings, in the court's terms, basically how to pull the wool over the Board of Parole Hearings' eyes. And his whole [modus operandi] as was related by Officer Parks based on the conversations he had with Mr. Holston corroborate the process that was established with Mr. Rosser.
>
> "[¶] . . . [¶]
>
> "And, once again, the phone discussions that Mr. Holston and Mr. Parks had point to his knowledge of the whole process and how they were going about putting the paperwork together and submitting the paperwork, not to mention his signing of the letter. [¶] All of these things point[] to his knowledge that the paperwork he submitted on behalf of Mr. Rosser for him to use in his suitability hearing was submitted with [the] intent of having those documents used in a legal proceeding and they were false documents.

7

"And so based on all of that, and the totality of the evidence, the court finds that the People have established good cause for a violation."

## III.

## DISCUSSION

A.   *The trial court did not abuse its discretion in admitting Rosser's hearsay statements; any error in admitting Anderson's hearsay statements was harmless*

Holston claims that the trial court erred in admitting certain hearsay statements made by Rosser and Anderson to investigators.  Holston contends that the trial court erred in determining that the People established good cause for permitting the introduction of the hearsay evidence.

1.   *Governing law*

"In reviewing the trial court's decision to admit the hearsay . . . testimony, we begin with the well-established principle that parole . . . revocation is not part of a criminal prosecution, and thus 'the full panoply of rights due a defendant in [a criminal] proceeding does not apply . . . .' "  (*People v. Shepherd* (2007) 151 Cal.App.4th 1193, 1198.)  However, in order to be admitted as evidence in a parole revocation proceeding, hearsay evidence offered in lieu of live testimony must not run afoul of the principles laid down in *Morrissey v. Brewer* (1972) 408 U.S. 471 and *Gagnon v. Scarpelli* (1973) 411 U.S. 778, the two "seminal" United States Supreme Court cases which have "set forth the procedural safeguards required by the federal Constitution for revocation proceedings."  (*People v. Arreola* (1994) 7 Cal.4th 1144, 1152 (*Arreola*).)  As the *Arreola* court explained, in those cases, "the United States Supreme Court held that, under the due process

8

clause of the federal Constitution, a defendant at a parole or probation revocation hearing generally has the right 'to confront and cross-examine adverse witnesses (*unless the hearing officer specifically finds good cause for not allowing confrontation*) . . . .' " (*Id.* at p. 1148, italics added, citing *Morrissey v. Brewer*, *supra*, 408 U.S. at p. 489 and *Gagnon v. Scarpelli*, *supra*, 411 U.S. at p. 786.)

In *Arreola,* the California Supreme Court articulated the manner by which California courts are to determine whether sufficient good cause exists for not allowing such confrontation. (*Arreola*, *supra*, 7 Cal.4th at pp. 1159-1160.) "The broad standard of 'good cause' is met (1) when the declarant is 'unavailable' under the traditional hearsay standard (see Evid. Code, § 240), (2) when the declarant, although not legally unavailable, can be brought to the hearing only through great difficulty or expense, or (3) when the declarant's presence would pose a risk of harm (including, in appropriate circumstances, mental or emotional harm) to the declarant." (*Arreola*, *supra*, at pp. 1159-1160.) The *Arreola* court explained further that the good cause showing must be balanced against other circumstances relevant to a determination of whether to admit the hearsay evidence:

> "[I]n determining the admissibility of the evidence on a case-by-case basis, the showing of good cause that has been made must be considered together with other circumstances relevant to the issue, including the purpose for which the evidence is offered (e.g., as substantive evidence of an alleged probation violation, rather than, for example, simply a reference to the defendant's character); the significance of the particular evidence to a factual determination relevant to a finding of violation of probation; and whether other admissible evidence, including, for example, any admissions made by the probationer, corroborates the former testimony, or whether, instead, the former testimony constitutes the sole evidence establishing a violation of probation." (*Arreola*, *supra*, at p. 1160.)

9

2.      *Standard of review*

"We review rulings on whether hearsay was improperly admitted at a [parole] violation hearing for abuse of discretion."  (*People v. Abrams* (2007) 158 Cal.App.4th 396, 400; see *In re Miller* (2006) 145 Cal.App.4th 1228, 1235 (*Miller*) [stating that the determination of whether hearsay evidence may be admitted in a parole revocation proceeding " 'rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion' "].)[6]

We reject Holston's contention that, pursuant to *People v. Stanphill* (2009) 170 Cal.App.4th 61, 78 (*Stanphill*), the de novo standard of review applies in this appeal.  In *Stanphill*, the court applied the de novo standard of review in determining whether "the trial court failed to apply the proper balancing test for admissibility."  (*Ibid.*)[7]  In contrast, in this case, *whether* the trial court was required to apply the balancing test for the admission of hearsay evidence is not at issue.  Rather, Holston contends that the trial court erred in its *application* of the balancing test.  As noted above, we review a trial court's application of the

_____

[6]      Although *Abrams* involved a *probation* revocation proceeding, "[p]arole revocation and probation revocation after the imposition of a sentence are constitutionally indistinguishable."  (*Miller*, *supra*, 145 Cal.App.4th at p. 1235.)

[7]      The *Stanphill* court concluded that the trial court had not erred in failing to apply the balancing test of *Arreola* because "spontaneous statements under [Evidence Code] section 1240 are a special breed of hearsay exception which automatically satisfy a probationer's due process confrontation/cross-examination rights without the court having to find good cause."  (*Stanphill*, *supra*, 170 Cal.App.4th at p. 81.)  The *Stanphill* court applied the abuse of discretion standard of review in determining whether the hearsay evidence was admissible as a spontaneous statement.  (*Id.* at p. 77.)

balancing test for the introduction of hearsay evidence at a parole revocation

hearing for an abuse of discretion. (See, e.g., *Miller*, *supra*, 145 Cal.App.4th at p.

1235.)

3.     *Factual and procedural background*

     a.     *The defense's motion to exclude the statements of three hearsay declarants*

Prior to the evidentiary portion of Holston's parole revocation hearing,

defense counsel orally moved to exclude hearsay statements made by three

individuals to investigators that the defense anticipated the People would attempt

to offer at the hearing. First, the defense argued that the trial court should exclude

hearsay statements made by Hill to the effect that he did not write a letter offering

Rosser employment if Rosser were paroled. Defense counsel argued that Hill had

a criminal history and a reason to be untruthful with respect to whether he had

authored the letter. Defense counsel further argued that Hill could have easily

been brought to the hearing.

Defense counsel also argued that the court should exclude hearsay

statements made by Rosser. Counsel specifically mentioned Rosser's statement to

Special Agent Hopkins that the anger management certification was false.

Defense counsel argued that Rosser's statements constituted "very important

evidence," and that Rosser was "inherently unreliable" since he was a life inmate.

In addition, counsel argued that Rosser had "used these anger management

11

certificates in his Board of Parole hearing, so he was either lying to the Board of Parole Hearings or lying to an investigator in this case."

Defense counsel also sought to exclude hearsay statements made by Anderson concerning whether Ibarra was a certified anger management counselor. Counsel argued, "[W]e see no reason why this witness wasn't subpoenaed." Counsel also stated that documents existed that indicated that Ibarra was in fact certified.

Defense counsel added that "this is a very important case," in that if the court were to find that Holston had violated parole, such a finding would potentially result in Holston being imprisoned for life.

         b.      *The People's arguments in support of admission of the hearsay statements*

The prosecutor responded by arguing that the trial court should permit the People to present the hearsay statements from all three individuals. With respect to Hill, the People contended that Hill had denied having written the employment offer letter that was sent to Rosser. The prosecutor argued further that Hill's statement that he had not written the letter was "not that important" because Rosser had stated that he had not had any contact with Hill and there was other evidence demonstrating that the employment offer letter was false.

With respect to Rosser, the People argued that Rosser was currently a "lifer inmate" who had suffered a conviction for murder, and who had been denied

12

parole for five years in 2013. The prosecutor noted that Rosser was in a prison in northern California and argued as follows:

> "Based on the location, the charges, the dangerousness of Mr. Rosser, the People believe it was not appropriate to subpoena him at great expense, at a great distance and great danger[] to those transporting and those in the courtroom in order to bring him in here today."

The People also noted that Rosser had admitted to Special Agent Hopkins that the letters from Holston that were presented at Rosser's parole hearing were false, and argued that these admissions were against Rosser's penal interests and were therefore reliable.

As to Anderson's statement that Ibarra was not a certified anger management counselor, the prosecutor contended that Anderson had "no reason to speak inappropriately or dishonestly about Ms. Ibarra," and argued that Anderson's statement was "not all that relevant" in any event.

c.      *Additional argument by counsel*

Defense counsel and the prosecutor each made several additional arguments in support of their respective positions. The defense argued that the hearsay evidence at issue in this case was the "least reliable type of hearsay," namely, "unsworn verbal allegations." In addition, defense counsel responded to the People's contention that it would be "inconvenient and perhaps dangerous," to transport Rosser to court by emphasizing the importance of the hearing to Holston, and noting that the People had transported other witnesses from the prison at which Rosser was housed to the parole revocation hearing. Defense counsel also stated that it was important for the defense to have the opportunity to cross-

13

examine Rosser because Rosser might "have had a beef with Mr. Holston when in prison" or he might harbor some other bias against Holston.

The People responded by arguing that the admissibility of the hearsay statements was supported by the fact that other evidence corroborated the substance of those statements. For example, the People noted that Holston had made several damaging admissions concerning CJOS to Officer Parks during Parks's pretextual call with Holston, including that Holston could, according to the prosecutor, "backdate documents." The People also stated that the other witnesses who had been transported from afar to the hearing did not pose the risks that Rosser posed.

### d. *The court's ruling*

In making its ruling, the trial court began by reciting several of the factors that a trial court must consider in determining whether to admit hearsay evidence, including whether the People had exercised due diligence in attempting to have witnesses appear in person at the hearing, the importance of the hearsay statements to the court's findings, and the reliability of the hearsay statements. The court then issued rulings with respect to each hearsay declarant.

With respect to Hill, the trial court stated that the People "did not exercise due diligence" in attempting to secure his presence for the hearing and determined that the "reliability of his testimony would be questionable." The court ruled that "there is no good reason as to why [Hill] is not present," and precluded the People from presenting Hill's hearsay statements at the hearing.

14

The court ruled that Rosser's statements that the documents sent by Holston were false could be admitted, reasoning:

> "As to Anthony Rosser who is a parolee, he is a lifer inmate. The People did establish good cause for him not being here in that it would be dangerous to try and transport him as well as the expense involved. [¶] [Rosser] essentially made statements against his penal interest which would make his . . . hearsay . . . statements . . . more reliable, and so in conducting the balancing test, the court finds that that evidence would be reliable and will be admissible."

The court also ruled that the People would be permitted to present evidence with respect to Anderson's hearsay statements concerning whether Ibarra is a certified anger management counselor. The court reasoned that Anderson's statements could be deemed reliable because it "would clearly undermine the reputation of his business for him to not be truthful in talking to the investigator in this instance and so essentially he would be making statements against his penal interest if he were to falsify any of those statements."

4. *The trial court did not abuse its discretion in admitting Rosser's hearsay statements*

As set forth above, the prosecutor noted that Rosser was a convicted murderer who was incarcerated in a state prison far from the location of the hearing. The prosecutor argued that it would be difficult, expensive, and potentially dangerous to transport Rosser to the hearing. Under these circumstances, the trial court did not abuse its discretion in determining that the People had established good cause for Rosser's unavailability. (See *Arreola*, *supra*, 7 Cal.4th at p. 1160 ["The broad standard of 'good cause' is met . . . when the declarant, although not legally unavailable, can be brought to the hearing only

15

through great difficulty or expense."].)  We reject Holston's argument, unsupported by any authority, that the trial court erred in making its finding because there was no evidence that Rosser posed a "particular danger," apart from his status as a convicted murderer serving a life sentence who had recently been denied parole.

The trial court also reasonably determined that the admissibility of Rosser's statements was supported by the fact that the statements at issue were against Rosser's penal interest.  (See *People v. McCurdy* (2014) 59 Cal.4th 1063, 1108 ["An extrajudicial declaration against the declarant's penal interest, however, is admissible as an exception to the hearsay rule."].)  While Holston contends that Rosser may have told Special Agent Hopkins that the documents were false in an attempt to curry favor, the trial court was not required to adopt this inference.  The trial court could have reasonably determined that the reliability of Rosser's statements, which were facially against his penal interest, supported their admissibility.  (See *Miller*, *supra*, 145 Cal.App.4th at p. 1235 [noting that "indicia of reliability" is a factor that a court may consider in determining the admissibility of hearsay evidence at a parole revocation hearing].)

Although not specifically mentioned by the trial court, the court also could have reasonably relied on the prosecutor's argument that the fact that other evidence corroborated the statements supported the admissibility of Rosser's statements.  (See *Arreola*, *supra*, 7 Cal.4th at p. 1160.)  For example, the prosecutor pointed to evidence that Holston offered to provide similar falsified

16

documents to Officer Parks during the pretextual phone call.  The trial court could have found that this evidence corroborated Rosser's statements that the documents Holston provided to him were fraudulent.  (See *ibid.*)

Finally, we acknowledge that there are factors that would have supported the exclusion of Rosser's statements, including that the statements were unsworn verbal statements of a third party, which courts have characterized as " 'the least reliable type of hearsay.' "  (*Miller*, *supra*, 145 Cal.App.4th at p. 1238, quoting *U.S. v. Comito* (9th Cir. 1999) 177 F.3d 1166, 1171.)  However, the record reveals that the trial court heard extensive argument on the issue, considered the relevant factors, and provided a reasoned ruling supported by the evidence.  Under these circumstances, we conclude that the trial court did not abuse its discretion in admitting the statements.

5. *Any error in admitting Anderson's hearsay statements was harmless*

Holston contends that the trial court erred in admitting Anderson's hearsay statements that Ibarra was not a certified anger management counselor because the People "offered no cause, good or otherwise, for failing to produce Anderson."

Even assuming that the trial court erred in admitting the statements because the People failed to provide any reason for failing to produce him at the hearing, the issue of whether Ibarra was a certified anger management counselor was of little, if any, importance in determining whether Holston violated parole.  Further, the trial court expressly stated that, even assuming that Ibarra *was* certified, the

17

fact remained that Holston provided Rosser with a false certificate to the effect that Rosser had attended anger management classes:

> "There has been an issue that has been delved into quite a bit about whether or not Ms. Ibarra was certified at the time she issued the certificate for anger management for Mr. Rosser. And the evidence has been quite unclear. . . . [¶] . . . [¶] Even if she was certified, let's assume she was certified, the bottom line is, she prepared a certificate for Mr. Rosser without him attending any classes. And she signed that certificate which was submitted by Mr. Holston as part of Mr. Rosser's packet for his suitability hearing."

Further, there was strong evidence that Holston had violated his parole, wholly independent of whether Ibarra was a certified anger management counselor. As the trial court stated, "There is more than one smoking gun in this case, and to this court it is quite clear what transpired. Officer Parks's phone conversations with Mr. Holston speak volumes."

Under these circumstances, it is clear that the trial court's admission of Anderson's statements did not contribute in any manner to the court's order revoking Holston's parole. Accordingly, we conclude that any error committed by the trial court in admitting Anderson's statements concerning Ibarra's certification was harmless, under any standard of prejudice.

B.    *The trial court did not err in denying Holston's motion to strike Special Agent Hopkins's testimony based on the People's failure to disclose a tape-recording of an interview on which Hopkins's testimony was based; nor did the court err in denying Holston's alternative request to disclose the tape-recording at the hearing*

Holston contends that the trial court erred in denying his motion to strike Special Agent Hopkins's testimony concerning admissions that Holston made during Hopkins's interview with him. Holston maintains that the trial court should

18

have stricken the testimony because the People failed to disclose the existence of a tape-recording of the interview to the defense prior to the hearing.[8]  Holston also contends that the trial court erred in denying his alternative request that the People disclose the tape-recording at the hearing in order to permit defense counsel to adequately cross-examine Special Agent Hopkins.[9]

Holston maintains that the "Due Process Clause's guarantee of fundamental fairness in the deprivation of liberty" mandated disclosure of the tape-recording.[10] In support of this contention, Holston cites *Brady v. Maryland* (1963) 373 U.S. 83, 87 (*Brady*), and contends that "the question of a defendant's right to exculpatory evidence at a parole revocation proceeding is an open one in California."

Even if we were to conclude that *Brady* applies in parole revocation proceedings, it is clear that Holston has failed to establish a *Brady* violation in this case.[11]

---

[8]    As Holston notes in his brief, "Hopkins had not provided a copy of this recording to the prosecutor, and the fact of the tape-recording was news to both the prosecutor and defense counsel."

[9]    We agree with the People that defense counsel's statements at the hearing are ambiguous with respect to whether he was making such an alternative request. However, we assume that counsel made such a request and consider whether the court erred in denying the request.

[10]    In his reply brief, Holston makes clear that he does not contend that the prosecution was required to disclose the recording pursuant to statutory rules of discovery governing criminal proceedings.

[11]    We emphasize that we express no opinion on whether *Brady* applies in the context of parole revocation proceedings.

1. *Governing law*

" '*Brady* exculpatory evidence is the only substantive discovery mandated by the United States Constitution.' " (*Jones v. Superior Court* (2004) 115 Cal.App.4th 48, 62.) In *People v. Williams* (2013) 58 Cal.4th 197, 255-256 (*Williams*), the California Supreme Court outlined the law governing *Brady* claims:

> " 'Under the federal Constitution's due process clause, as interpreted by the high court in *Brady* . . . , the prosecution has a duty to disclose to a criminal defendant evidence that is " 'both favorable to the defendant and material on either guilt or punishment.' " [Citations.] . . . '[The] touchstone of materiality is a "reasonable probability" of a different result . . . . The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. A "reasonable probability" of a different result is accordingly shown when the government's evidentiary suppression "undermines confidence in the outcome of the trial." ' [Citation.] In determining whether evidence is material under this standard, we consider ' "the effect of the nondisclosure on defense investigations and trial strategies." ' " (*Williams*, *supra*, 58 Cal.4th at pp. 255-256.)

"We independently review the question whether a *Brady* violation has occurred, but give great weight to any trial court findings of fact that are supported by substantial evidence." (*People v. Letner and Tobin* (2012) 50 Cal.4th 99, 176.)

2. *Application*

In his brief on appeal, Holston notes that Special Agent Hopkins testified at the parole revocation hearing concerning a tape-recorded interview that he conducted with Holston. Holston contends that Special Agent Hopkins testified that Holston made various admissions during the interview and maintains that defense counsel's ability to impeach Hopkins was impeded by the People's failure to produce a copy of the recording of the interview. This argument fails because

20

the only testimony from *Special Agent Hopkins* that Holston refers to in his brief in support of this argument is Hopkins's testimony that Holston admitted during the interview that he was married to Ibarra. Holston does not dispute that he was married to Ibarra and does not present any argument as to how a recording of the interview would have permitted him to impeach Special Agent Hopkins on this subject.

Holston does cite to other purported admissions that he made to *Officer Parks* during a *separate* conversation during which Officer Parks posed as an inmate seeking Holston's assistance in obtaining documents for a parole hearing. For example, Holston contends, as did his trial counsel, that there was ambiguity with respect to several statements that he purportedly made to *Officer Parks* concerning the manner by which Holston could assist Officer Parks in obtaining certificates of completion for various self-help classes. *Special Agent Hopkins*, however, provided no testimony concerning this issue.

In sum, Holston has failed to identify any portion of Special Agent Hopkins's testimony concerning his interview of Holston as to which the tape-recording was necessary in order to permit defense counsel to effectively impeach Hopkins. Holston has therefore failed to establish that the tape-recording of Hopkins's interview was *material* to the outcome of the hearing, a necessary element of a successful *Brady* claim. (See *Williams*, *supra*, 58 Cal.4th at pp. 255-256.)

21

Accordingly, we conclude that the trial court did not err in denying Holston's motion to strike Special Agent Hopkins's testimony or in denying his request to order the People to disclose the recording at the hearing in order to permit defense counsel to effectively impeach Special Agent Hopkins.[12]

IV.

DISPOSITION

The order revoking parole is affirmed.

AARON, Acting P. J.

WE CONCUR:

IRION, J.

PRAGER, J.[*]

---

[12]  Holston also contends that when the trial court's purported error in admitting the hearsay statements of Rosser and Anderson is considered together with the purported error in failing to disclose the tape-recording, the "cumulative prejudice" stemming from these errors warrants reversal. We concluded in part III.A.4., *ante*, that the trial court did not abuse its discretion in admitting Rosser's hearsay statements. Any error in admitting Anderson's hearsay statements was harmless under any standard of prejudice, even when considered in combination with any purported error in failing to require the People to disclose the tape-recording of Special Agent Hopkins's interview with Holston.

[*]  Judge of the San Diego Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.